**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BLUEFIELD DIVISION**

JOHNNY RAY LAW,          )
      **Plaintiff,**      )
          )
v.                  )      **CIVIL ACTION NO. 1:13-1253**
          )
CAROLYN. W. COLVIN,      )
**Acting Commissioner of Social Security,**    )
      **Defendant.**      )

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Order entered January 24, 2013 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties cross-Motions for Judgment on the Pleadings (Document Nos. 13 and 14.) and Plaintiff's Response. (Document No. 15.)

The Plaintiff, Johnny Ray Law (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on April 22, 2010 (protective filing date), alleging disability as of March 20, 2010, due to "back and neck injury." (Tr. at 14, 76, 98, 102.)  The claims were denied initially and upon reconsideration. (Tr. at 31-33, 40-42, 310-12, 316-18.) On November 19, 2010, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 43.) A hearing was held on November 9, 2011, before the Honorable Steven A. DeMonbreum. (Tr. at 319-43.)  By decision dated November 25, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-28.) The ALJ's decision became the final decision of the Commissioner on December 27, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 5-9.) Claimant filed the present action seeking judicial review of the administrative decision on January 22, 2013, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the

burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2011). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings

2

to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§

404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, March 20, 2010. (Tr. at 16,

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "adjustment disorder/depression; degenerative disc disease; borderline intellectual functioning; anxiety disorder/social phobia; and history of obesity," which were severe impairments. (Tr. at 16, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity to perform a range of light work as follows:

> Specifically, the [C]laimant can lift and/or carry (including upward pulling) up to 20 pounds occasionally and 10 pounds frequently; can stand and/or walk (with normal breaks) for six hours and sit (with normal breaks) for six hours in an eight-hour workday; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, kneel, crouch, crawl, and stoop/bend; should avoid concentrated exposure to temperature extremes and vibration; should avoid even moderate exposure to hazards; and is limited to simple, unskilled work involving minimal interaction with the public and coworkers.

(Tr. at 18-19, Finding No. 5.) At step four, the ALJ found that Claimant was unable to return to his past relevant work. (Tr. at 26, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a dishwasher, housekeeper, and garment presser, at the light level of exertion. (Tr. at 27-28, Finding No. 10.) On this basis, benefits were denied. (Tr. at 28, Finding No. 11.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must

5

not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on January 14, 1961, and was 50 years old at the time of the administrative hearing on November 9, 2011. (Tr. at 26, 76, 324.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 26, 101, 103, 325.) In the past, he worked as an unloader and stock clerk . (Tr. at 26, 130-35, 137-38, 326-29, 338-39.)

<u>The Medical Record</u>

The Court has considered all evidence of record, including the medical evidence and will discuss it below in relation to Claimant's arguments.

***<u>Mental Impairments</u>***:

*<u>Tonya McFadden, Ph.D.</u>*:

Claimant underwent a consultative mental status examination on May 24, 2011. (Tr. at 259-63.) Claimant reported impaired memory for the last six to eight months and depression. (Tr. at 260.) Additionally, he related decreased interest and appetite, intermittent feelings of hopelessness, forgetfulness, thoughts of death when he felt worthless but denied any plan of suicide, periods of anxiety, an avoidance of people all his life, and fear of embarrassing himself around others. (<u>Id.</u>) On mental status exam, Dr. McFadden observed that Claimant was pleasant and cooperative, presented with relevant and coherent speech that was delivered with normal rhythm and tone, was oriented in all spheres, had normal stream of thought, and intact immediate memory. (Tr. at 261.) She noted that his mood was down and his affect was restricted,  insight was fair, psychomotor behavior was mildly slow, judgment was deficient, recent memory was markedly deficient and remote memory was fair, pace was mildly slow, persistence was fair, he had difficulties with concentration, and mildly deficient social functioning. (Tr.

at 261-62.) Dr. McFadden diagnosed adjustment disorder with mixed anxiety and depressed mood and social phobia, provisionally. (Tr. at 262.) She opined that his prognosis was fair with sustained treatment. (Id.)

Dr. McFadden also completed a form Medical Source Statement of Ability to Do Work-Related Activities (Mental), on which she opined that Claimant had marked ability to understand, remember, and carry out complex instructions; make adjustments on complex work-related decisions; and interact appropriately with the public and co-workers. (Tr. at 256-58.) She further opined that he was moderately limited in the ability to interact with supervisors, respond appropriately to usual work situations and to changes in a routine work setting, and make judgment on simple work-related decisions. (Id.) Finally, she opined that Claimant had mild limitations in his ability to understand, remember, and carry out simple instructions. (Tr. at 256.) In support of these findings, Dr. McFadden noted that the mental status evaluation revealed that Claimant's recent memory was markedly deficient, his concentration was mildly deficient, and his judgment was deficient. (Id.) Furthermore, he presented with symptoms of social phobia and reported a pattern of staying to himself when he worked. (Tr. at 257.)

_Dr. Stephen M. Miller, D.O._:

On July 28, 2011, Claimant's primary care physician, Dr. Miller, noted that he was depressed, had suicidal thoughts, and angered easily. (Tr. at 287.) Dr. Miller prescribed Cymbalta 60mg. (Tr. at 288.) On August 23, 2011, Dr. Miller noted that claimant appeared depressed and presented with a flat affect. (Tr. at 289.) He continued him on Cymbalta. (Tr. at 290.)

_Dr. L. Andrew Steward, Ph.D._:

On September 12, 2011, Dr. Steward conducted a psychological evaluation at the request of Claimant's attorney. (Tr. at 296-303.) Claimant reported that he constantly was nervous and depressed. (Tr. at 297.) He remained nervous in part due to health problems, financial instability, children, crowds, and noise. (Id.) He reported that he was irritable, his memory and concentration wandered, had suicidal thoughts at times but lacked any intent, did not sleep well due to pain, cried a lot, felt useless and worthless, felt helpless and hopeless, had low self-esteem, occasionally heard sounds that were not there,

7

and was paranoid and thought people were watching him. (Id.) Dr. Steward noted on mental status exam that Claimant's mood was anxious and dysphoric and his affect was restricted, he was oriented in all spheres, his thought content and organization was impoverished but not confused, and all mental and memory functions were significantly depressed. (Id.)

Results of the Wechsler Adult Intelligence Scale-IV (WAIS-IV) revealed a Full Scale IQ score of 71, which placed him at the lowest end of the borderline intellectual functioning range. (Tr. at 299-300.) The BAI and BDI-II indicated that Claimant suffered from severe anxiety and severe depression. (Tr. at 299, 301.) Results of the clinical scales of the PAI indicated that Claimant was significantly elevated in eight areas including, somatization, anxiety, anxiety-related disorders, depression, schizophrenia, borderline tendencies, suicidal ideation, and stress scales. (Tr. at 300-01.) Dr. Steward diagnosed major depressive disorder, single episode, severe without psychotic features; generalized anxiety disorder; social phobia; borderline intellectual phobia; and assessed a GAF of 47.[2] (Tr. at 302.)

Dr. Steward opined that Claimant's functioning at the low end of the borderline intellectual functioning range was a lifelong condition based upon his education, employment, behavior, and test performances. (Tr. at 303.) He further opined that Claimant is "permanently and totally disabled from any type of gainful employment currently and readily available in the United States economic market on a sustained basis for at least a year or more." (Id.) He suggested that his prognosis was poor for large gains in behavior, though he thought Claimant was capable of managing his own benefits. (Id.)

Dr. Steward also completed a form Medical Source Statement of Ability to Do Work-Related Activities (Mental), on which he opined that Claimant was extremely limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular

---

[2]     The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 41-50 indicates that the person has some serious symptoms "(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994)

attendance, and be punctual; work with or near others without being distracted by them; complete a normal workday or workweek; perform at a consistent pace; and interact appropriately with the public and supervisors. (Tr. at 293-95.) He further opined that Claimant had marked limitations in his ability to interact appropriately with co-workers; respond appropriately to work pressures in a usual work setting; understand, remember, and carry out detailed instructions; sustain an ordinary routine without special supervision; and make simple work-related decisions. (Id.) Finally, Dr. Steward opined that Claimant was moderately limited in his ability to remember locations and work-like procedures; understand, remember, and carry out short, simple instructions; and respond appropriately to changes in a routine work setting. (Id.)

*Kelly Robinson, M.A.*:

On October 3, 2011, Ms. Robinson conducted a psychological evaluation with psychometrician Elise Bowling. (Tr. at 304-06.) Claimant was administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and the results were considered invalid due to the elevation of the "F" scale. (Tr. at 304-05.)  Such elevation suggested that Claimant possibly failed to understand the test items; failed to cooperate; had some distortion due to confusion, delusional thinking or other psychotic processes; exaggerated the severity of psychopathology in an attempt to derive secondary gain; or exhibited a plea for help. (Tr. at 305.) Ms. Robinson diagnosed adjustment disorder with mixed anxiety and depressed mood, by record; and social phobia, provisionally, by record. (Id.) Ms. Robinson's diagnoses were based on Dr. McFadden's diagnoses, the only record she reviewed. (Tr. at 304-05.) Ms. Robinson opined that Claimant's social functioning, attention and concentration, and pace were within normal limits. (Tr. at 305-06.) His persistence was mildly deficient. (Tr. at 306.) Ms. Robinson opined that Claimant's prognosis was fair. (Id.)

**Physical Impairments**:

*Dr. Gary Craft, M.D.*:

Dr. Craft conducted a physical examination on July 26, 2010. (Tr. at 183-87.) Claimant sustained injuries to his neck and low back when lifting on the job on March 28, 2010. (Tr. at 183.) He reported

sharp, localized pain over the posterior neck and sharp pain over the low back which radiated to the right leg. (Id.) He took Naproxen 1500mg and Flexeril 30mg daily for pain. (Tr. at 184.) Dr. Craft noted on physical exam that Claimant was alert and cooperative, fully ambulatory and free of any acute distress or assistive device, had full range of upper extremity motion with intact manipulation, sensation, strength, reflexes, and grip strength. (Tr. at 183-84.) He had a ten degree loss in range of neck motion in all directions and palpation of the posterior neck produced tenderness. (Tr. at 184.) Claimant's forward bending was 70 degrees, squatting was fair, he had a minimal limp on the right, toe and heel walking was normal, he had full range of lower extremity motion, sensation and strength were normal, and straight leg raising test was negative bilaterally. (Tr. at 185) The x-rays of the lumbosacral spine revealed mild degenerative changes. (Id.) Dr. Craft opined that the long-term prognosis of Claimant's musculoskeletal system was fair. (Id.)

*Dr. Franyutti, M.D. - Physical RFC Assessment*:

On August 14, 2010, Dr. Franyutti, a reviewing state agency medical consultant completed a form Physical RFC Assessment on which he opined that Claimant's physical impairments reduced him to performing light exertional level work with occasional postural limitations with the exception that he never climb ladders, ropes, or scaffolds. (Tr. at 189-95.) He further opined that Claimant should avoid concentrated exposure to temperature extremes and vibration, and avoid even moderate exposure to hazards, such as machinery and heights. (Tr. at 192.) In reaching his opinion, Dr. Franyutti reviewed Dr. Craft's consultative examination report, x-rays, and treatment notes from Dr. Greenburg and Dr. Miller. (Tr. at 195.) He noted that Claimant was unable to drive due to back pain, was unable to lift, unable to stand longer than five minutes, unable to reach very high, and could walk only one quarter mile. (Id.)

Dr. A. Rafael Gomez, M.D., reviewed all the evidence of file and affirmed Dr. Franyutti's opinion as written on October 6, 2010. (Tr. at 199.)

*Dr. Stephen Miller, D.O.*:

The medical record contains Dr. Miller's treatment records from August 7, 2000, through July 28, 2011. (Tr. at 200-51, 285-92.) On March 30, 2010, despite a history of intermittent back pain,

Claimant reported low back pain with right leg radiation since having lifted something heavy at work. (Tr. at 209.) He also reported neck pain with radiation into his arm. (Id.) Medical exam revealed neck tenderness to palpation, reports of pain on movement and left upper extremity numbness at times, tenderness to the back with minimal palpation, negative bilateral straight leg raising test, active range of motion, and normal strength. (Id.) Dr. Miller diagnosed lumbar radiculopathy and strain, and prescribed Naproxen 500mg and Flexeril 10mg. (Id.) Claimant was considering filing a Worker's Compensation claim. (Id.)

On April 6, 2010, Claimant reported continued low back pain with radiation down the right leg and rated the pain at a level eight out of ten. (Tr. at 208.) He was using heat and taking Naproxen but the condition was worsening. (Id.) He had significant muscle spasm bilaterally in the low back with pain on prolonged standing or sitting. (Id.) On exam, Dr. Miller observed positive straight leg raising test at 45 to 50 degrees on the right with low back pain and a little weakness with dorsal flexion of the right foot. (Id.) Claimant's pain was the same and unimproved on June 29, 2010, and was worse with sitting and standing. (Tr. at 205.) He tried physical therapy for a few sessions, but the therapy made the pain worse and he quit going. (Id.) On exam, Dr. Miller again observed positive straight leg raising on the right, pain with toe and heel walking, and 5/5 strength in the left leg and 4/5 strength in the right leg. (Id.) Claimant reported on August 31, 2010, that he was unable to maintain any position other than for short periods of time and that he had to keep moving around. (Tr. at 204.) He reported poor sleep at night due to back pain and that he had difficulty lifting, stooping, climbing, crawling, and basically any movement. (Id.) On exam, Claimant was able to flex forward at the waist only to 40 or 50 degrees and could rotate either right or left to about 40 degrees. (Id.) He had normal leg strength bilaterally. (Id.) Claimant stated on September 28, 2010, that he could lift only two pounds at a time, and on October 28, 2010, indicated that he could not return to work. (Tr. at 202-03.)

On September 25, 2010, Dr. Miller completed a form Medical Assessment of Ability to Do Work-Related Activities (Physical), on which he opined that Claimant was capable of lifting and carrying ten pounds on an occasional basis and less than ten pounds on a frequent basis. (Tr. at 196-98.) He

opined that Claimant could stand, walk, and sit less than two hours in an eight-hour workday, needed to change position every five to ten minutes, and required a sit/stand option. (Tr. at 196.) Dr. Miller attributed these limitations to a herniated disc at L3-L4 and diminished strength in the right leg. (Tr. at 197.) He further opined that Claimant could occasionally balance, stoop, crouch, and kneel,  but could never climb or crawl. (Id.) He also indicated that Claimant's ability to push and pull was affected by his physical impairments. (Id.) As a result of Claimant's physical impairments, Dr. Miller opined that Claimant would miss work more than three times a month. (Tr. at 198.)

On February 23, 2011, Claimant reported continued and constant low back pain and right leg pain. (Tr. at 292.) On exam, he had restricted range with forward flexion at the waist, limited to 70 degrees and complained of low back pain with heel and toe walking. (Id.) He also reported a lot of back muscle spasms at night. (Id.) On June 23, 2011, Claimant rated his pain as an eight out of ten at its worst and at a seven or eight out of ten on average. (Tr. at 291.) He reported trouble sleeping due to pain. (Id.) On exam, he had stiffness in his low back with getting up and down from the chair, restricted low back motion in all planes, forward flexion to 75 to 80 degrees, and rotation at the waist to about 45 degrees left and right. (Id.) On July 28, 2011, Claimant reported that he received pieces of metal in his eye from a weedeater and had them surgically removed. (Tr. at 287.) He reported blurred vision on July 28 and August 23, 2011. (Tr. at 287, 289.)

*Dr. Abed (Sam) Koja, M.D., Board Certified Neurosurgeon*:

Dr. Miller referred Claimant to Dr. Koja, who examined Claimant on December 31, 2010. (Tr. at 285-86.) Claimant reported severe back and right leg pain with nonspecific numbness. (Tr. at 285.) He rated the pain at a level eight out of ten, and reported that he had pain whether he sat, stood, or walked. (Id.) Physical exam revealed moderate pain with flexion and extension, positive straight leg raising at 60 degrees on the right and 90 degrees on the left without weakness, but with depressed ankle and knee jerks. (Id.) Dr. Koja diagnosed lumbar spondylosis with radiculopathy. (Id.) Dr. Koja noted that the MRI was consistent with degenerative changes and foraminal stenosis, especially at L4-5 on the right. (Id.) Dr. Koja recommended continued therapy and use of heat, hot water, and exercises, and advised

against surgery. (Tr. at 285-86.) He advised that he might consider epidural blocks in the future. (Tr. at 286.)

_Dr. Theodore P. Werblin, M.D._:

Claimant treated with Dr. Werblin from July 15, 2011, through August 1, 2011. (Tr. at 264-84.) On July 15, 2011, Claimant reported that he was weedeating his grass when a stick hit his eye. (Tr. at 282.) A piece of metal was removed from his eye. (Tr. at 284.) On August 1, 2011, Claimant reported that his vision remained really blurry and that he saw floaters which had been there since the surgery to remove the piece of metal. (Tr. at 264.) On exam, visual acuity was 20/20 with glasses. (Tr. at 265.) Dr. Werblin advised that the blurry vision would go away to some degree but that it would take a few weeks to know how clear his vision would become. (Id.) He cleared Claimant to drive at any time. (Id.) Dr. Werblin further advised that his eye continued to heal and would take more time to stabilize. (Id.) He directed Claimant to continue using drops in the eye. (Tr. at 265-66.)

Claimant's Challenges to the Commissioner's Decision

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in placing the greatest weight on the opinion of Tonya McFadden because her opinion, as the first opinion given, was made without the benefit of having reviewed any other opinion and she failed to conduct any psychological testing. (Document No. 13 at 4-10.) Contrary to the ALJ's decision, Claimant asserts that Dr. McFadden's opinion was not "somewhat consistent" with Dr. Steward's findings. (Id. at 6.) Claimant submits that Dr. Steward completed psychological testing which essentially confirmed all three evaluators' diagnoses, but Dr. Steward had the advantage of an intelligence test that Dr. McFadden did not have. (Id. at 7.) Claimant further asserts that contrary to the ALJ's decision, Dr. McFadden's opinion was not corroborated by Ms. Robinson' s evaluation. (Id.) Ms. Robinson specifically noted that her diagnoses were based on Dr. McFadden's report because she, herself, did not conduct a mental status examination.  (Id.) Ms. Robinson's evaluation consisted solely of a MMPI-II, which she found was invalid. (Id.) Claimant submits that the only conflict in the mental evidence was between Dr. McFadden's report of mental status exam and opinion and the report and

13

opinion of Dr. Steward. (Id.) As the ALJ is charged with resolving conflicts in the evidence, Claimant asserts that the ALJ was required to resolve this conflict. (Id.) Claimant contends that Dr. Steward's findings were not rebutted. (Id.) Claimant also challenges separately the seven reasons cited by the ALJ for giving little weight to Dr. Steward's opinion. (Id. at 7-10.)

In response, the Commissioner notes at the outset that Dr. Steward was not a treating source under the Regulations as Claimant saw him for a one-time evaluation for his disability application, and therefore, his opinion was not entitled to any enhanced deference that evidence from a treating source may warrant. (Document No. 14 at 8.) The Commissioner asserts that the ALJ properly found that Dr. Steward's opinion was inconsistent with the record. (Id.) The Commissioner notes that Claimant failed to allege disability due to any mental condition and failed to allege any difficulty with any mental tasks. (Id.) The record did not support the extreme limitations assessed by Dr. Steward. (Id.) Though Dr. Steward checked that Claimant was extremely limited in his ability to interact with the public, the record demonstrated that he was cooperative, Ms. Robinson noted normal social functioning, Claimant reported that he had no problems getting along with others, and Dr. McFadden observed only mild limitations in social functioning. (Id. at 8-9.) Additionally, although Dr. Steward assessed extreme limitations in concentration, the Commissioner contends that the record fails to support such limitations as he had intact immediate memory, Ms. Robinson noted normal attention and concentration, and Dr. McFadden observed only one error when Claimant recited the days of the week backwards. (Id. at 9.)

The Commissioner points out that though Claimant emphasizes that Dr. Steward was the only opinion based on testing, the tests such as the Beck Anxiety Inventory and the Personality Assessment Inventory were based on Claimant's self-reported symptoms. (Id.) The Commissioner also notes that Claimant had no mental health treatment or significant complaints. (Id. at 9-10.) Further, as the ALJ noted in his decision, Dr. Steward's opinion of disability is reserved to the Commissioner. (Id. at 10.) Finally, the Commissioner notes, as did the ALJ, that the basis of Dr. Steward's opinion cannot be ignored. (Id. at 11.) The Commissioner asserts that Dr. Steward's opinion was sought for the purpose of obtaining an opinion for disability and not as an attempt to seek treatment for symptoms. (Id.) The

14

Commissioner therefore asserts that the ALJ appropriately accorded Dr. Steward's opinion less weight, and limited Claimant to performing unskilled work with minimal interaction with the public and co-workers. (Id.)

In reply, Claimant asserts that the Commissioner erred in advancing in her brief theories and illustrations to which the ALJ had not referred. (Document No. 15 at 2.) Specifically, Claimant asserts that whether or not he alleged a mental impairment in his application it was not a factor that would rebut a professional mental health opinion and he was not prohibited from advancing any demonstrable impairment despite having failed to mention it in his application. (Id.) Claimant asserts that the ALJ did not believe that Dr. Steward's findings warranted a conclusion of marked and extreme limitations and he cited three cases in his initial brief to support his statement. (Id. at 3.) He asserts that the Commissioner however, failed to address these cases and based "upon her personal perusal of the records" stated that the record did not support Dr. Steward's limitations. (Id.) Claimant further asserts that the Commissioner improperly professed her opinion on diagnostic test procedures regarding the subjective nature of the tests administered by Dr. Steward. (Id.) Finally, Claimant asserts that the Commissioner improperly equates treatment with illness and asserts that there is no correlation between lack of treatment and a professional diagnosis. (Id.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in according little weight to Dr. Miller's opinion. (Document No. 13 at 11-15.) Claimant asserts that the ALJ found that Dr. Miller's opinion was not supported by his treatment notes but failed to identify the supposed insufficiencies with specificity. (Id. at 12-13.) He next asserts that the ALJ found that Dr. Miller's treatment notes contained some abnormalities but that Claimant was in no acute distress, which contradicts the fact that the ALJ is not a medical doctor and ignores the fact that comments such as "feels well" and "normal activity" must be read in context. (Id. at 13.) Finally, Claimant asserts that when the ALJ found that Dr. Miller's course of treatment was inconsistent with his opinion and that if Claimant was as limited as Dr. Miller opined, then he should have pursued more aggressive treatment, he improperly was proffering medical opinions. (Id. at 13-15.) Claimant contends

15

that the ALJ erred in according great weight to the opinions of Drs. Franyutti, Gomez, Craft, and Greenberg. (Id. at 14.) Claimant asserts that all but Dr. Craft's reports pre-dated Claimant's alleged onset date, and therefore, were worthless. (Id.) Regarding Dr. Craft, Claimant asserts that an opinion of a one-time non-treating consultant does not outweigh the opinion of a treating source, Dr. Miller, of many years. (Id.)

In response, the Commissioner asserts that the ALJ identified several reasons for according less weight to Dr. Miller's opinion. (Document No. 14 at 11-12.) First, the ALJ noted that Dr. Miller's treatment notes as a whole did not support his extreme limitations. (Id.) Second, the ALJ noted that Claimant required only conservative treatment for his back. (Id. at 12.) Third, the ALJ noted that Drs. Franyutti and Gomez opined that Claimant could perform light work. (Id. at 12-13.) Although these physicians did not have the benefit of subsequent medical evidence, the Commissioner asserts that there always is some lapse between the consultant's report and the ALJ hearing and decision. (Id. at 13.) The ALJ, not the state agency medical consultants, makes the ultimate disability and RFC determinations. (Id.) The Commissioner contends that the ALJ gave the appropriate weight to Claimant's reported limitations when he limited him to a range of unskilled, light work, which was a significant reduction from his prior semi-skilled heavy work. (Id. at 14.) Accordingly, the Commissioner asserts that the ALJ's findings are supported by substantial evidence. (Id.)

Analysis.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2011). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a

non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2011). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and

resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

1. Opinions - Mental Impairments.

In the instant matter, the ALJ found that Dr. McFadden's opinion, which was based on her examination of Claimant and which was "somewhat consistent" with the findings of the other psychological evaluations of record, was entitled to greater weight. (Tr. at 25.) The ALJ gave little weight to Dr. Steward's opinion. (Tr. at 26.) The ALJ first reasoned that an opinion of disability is reserved to the Commissioner and cannot be given controlling weight. (Id.) The ALJ then found that Dr. Steward's opinion is not supported by the record and his findings failed to support his assessed marked and extreme limitations. (Id.) The ALJ noted that because Claimant failed to pursue mental health treatment strongly suggested that he was not as limited as Dr. Steward suggested. (Id.) Additionally, the treatment notes of record failed to document any considerable psychiatric objective abnormalities that would have been seen if Claimant was as limited as Dr. Steward suggested. (Id.) Furthermore, the ALJ noted that Dr. Steward rendered his opinion for purposes of Claimant's attempt to seek disability benefits rather than for purposes of treatment for symptoms. (Id.) The ALJ also noted that "such evidence is certainly legitimate and deserves due consideration," but "the context in which it was produced cannot be entirely ignored." (Id.) Finally, the ALJ noted that both Dr. Steward's and Ms. Robinson's testing rendered invalid profiles, which possibly suggested that Claimant exaggerated his symptoms. (Id.)

The ALJ properly noted that opinions of disability are reserved to the Commissioner. The

Regulations provide that a medical source's statement that a claimant is disabled or unable to work is an opinion on an issue reserved to the Commissioner because it is an administrative finding dispositive of a case. See 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) (2011). However, such opinions must not be ignored. See Mauzy v. Astrue, 2010 WL 1369107, *14 (N.D. W.Va. Mar. 30, 2010).

> The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

Id. In the instant case, the ALJ noted the standard and proceeded to evaluate Dr. Steward's opinion to determine if it was supported by the record. (Tr. at 22-24, 25-26.)

In evaluating Dr. Steward's opinion, the ALJ determined that his opinion was not supported by the record. (Tr. at 26.) The ALJ specifically noted that the marked and extreme limitations were not warranted by Dr. Steward's findings. (Id.) Although the ALJ did not state specifically how the limitations were not warranted by his findings, the ALJ summarized the findings of Dr. McFadden, Dr. Steward, and Ms. Robinson, as well as treatment notes from Dr. Werblin. It can be gleaned from these summaries that Claimant was not as limited as Dr. Steward suggested. For instance, Dr. Werblin repeatedly noted that Claimant was oriented and presented with a normal mood and affect. (Tr. at 22.) Similarly, his treating physician, Dr. Miller, noted no significant mental abnormalities on examination. (Id.) Dr. McFadden observed mild deficiencies in immediate memory and social functioning. (Tr. at 261-62.), and Ms. Robinson noted that Claimant's social functioning, concentration, and pace were within normal limits and his persistence was mildly deficient. (Tr. at 305-06.) Dr. Steward, however, opined that all memory and mental functions were significantly depressed without analyzing each function separately, with the exception of extreme limitations in attention and concentration for extended periods. (Tr. at 297.)

Admittedly, Dr. Steward's opinions were based in part on his psychological testing, including the WAIS-IV, BAI-II, BDI-II, and PAI. As the Commissioner points out, these tests, especially the BAI-II and the BDI-II are based primarily on Claimant's subjective self-reports, which do not equate to

objective medical findings. Furthermore, as the ALJ noted (Tr. at 26.), Claimant did not pursue mental health treatment. Although Claimant takes issue with the ALJ relying on the absence of treatment as a basis for discrediting the opinion of a medical consultant, the ALJ made mention of such absence to illustrate the point that if Claimant's mental condition was as severely limited as indicated by Dr. Steward, then one would think that Claimant would have sought treatment absent an intervening reason to the contrary. Such absence of treatment is relevant to the overall issue of severity of Claimant's mental condition.

Furthermore, the ALJ noted that Dr. Steward's opinion was generated by his attorney for purposes of seeking disability benefits. (Tr. at 26.) The ALJ made note of this fact in part to emphasize that Dr. Steward was not a treating source. Rather, Dr. Steward provided a one-time consultative examination at the request of Claimant's attorney. His opinion, therefore, is not entitled to any controlling weight. Claimant correctly notes, however, that simply because the opinion was attorney-generated does not allow the ALJ to disregard it. See Wooldridge v. Bowen, 816 F.2d 157, 160 n.4 (4th Cir. 1987)(finding that medical reports prepared at the direction of a claimant's attorney in social security proceedings are routine and that there is "no basis in the statute or case law for excluding medical reports of any examining physician on the ground that they were prepared for purposes of the claim being litigated.").  Nevertheless, although the ALJ may not exclude such a report for this reason, it is but one factor that the ALJ considers in the overall staging of the medical evidence. As discussed above, the facts indicate that Dr. Steward did not have a long-term relationship with Claimant.

Finally, the ALJ noted that both Dr. Steward's and Ms. Robinson's testing rendered invalid profiles which suggested, perhaps, that Claimant was exaggerating his symptoms. (Tr. at 26.) Claimant asserts that Dr. Steward stated that the high validity scale scores were due to an extremely negative evaluation of self and life in general. Dr. Steward did not believe that Claimant intentionally attempted to skew his scores. Claimant also asserts that Ms. Robinson never made such a suggestion. Dr. Steward's report indicates his belief that the reasons for the high validity scale PAI scores was due in part to "an extremely negative evaluation of self and life in general," as Claimant suggested. (Tr. at 301-02.) The

PAI, however, is a personality test that measures a wide scope of personality variables and contains 344 items. (Tr. at 300.) To a certain extent, Claimant's responses are subjective. To that extent, it is reasonable for the ALJ to have concluded that he exaggerated his responses to the questions, especially when exaggeration is a possible reason given by Ms. Robinson. Regarding the invalidity of the F scale elevation, Ms. Robinson did not cite a specific reason for the invalidity, but indicated five possible reasons, one of which included distortion or exaggeration of the severity of psychopathology in an attempt to derive secondary gain. (Tr. at 305.) Accordingly, it is reasonable for the ALJ to at least have considered the possibility of exaggeration of symptoms in the absence of any mental health treatment or any other evidence indicating serious mental health issues.

In view of the foregoing, the undersigned finds that the ALJ's decision to accord greater weight to the opinion of Dr. McFadden and lesser weight to the opinion of Dr. Steward is supported by the substantial evidence of record.

2. Opinions - Physical Impairments.

Claimant alleges that the ALJ erred in failing to accord greater weight to the opinion of his treating physician, Dr. Miller. In his decision, the ALJ gave Dr. Miller's September 25, 2010, opinion little weight because (1) his treatment notes and the record as a whole did not support such extreme limitations, (2) his physical examinations documented some abnormalities but he regularly found Claimant in no acute distress, (3) his course of treatment was inconsistent with his assessed limitations, and (4) if Claimant truly was as limited as Dr. Miller opined, then one would expect to see more aggressive treatment modalities pursued or stronger medication than Tramadol prescribed. (Tr. at 25.) Regarding the ALJ's first reason, although the ALJ specifically did not identify any inconsistencies in Dr. Miller's treatment notes in the section wherein he discounted his opinion, he previously summarized Dr. Miller's treatment notes. (Tr. at 20-21.) Treatment notes demonstrate that Claimant consistently presently with normal 5/5 muscle strength and generally negative bilateral straight leg raising with slight positive readings on occasion. An MRI on May 7, 2004, revealed only degenerative disc disease and a disc bulge. (Tr. at 20.) Dr. Koja noted an intact exam except for the back which revealed only moderate

pain with flexion and extension and positive straight leg raising on the right at 60 degrees, but there was no weakness. (Tr. at 21.) Dr. Koja did not recommend surgery. (Id.) Rather, he recommended continued heat, hot water, and exercise. (Id.) Furthermore, Dr. Craft observed that Claimant fully was ambulatory, free of acute distress or assistive device, had slight reduction in range of back motion, had normal heel and toe walking, and had negative bilateral straight leg raising. (Tr. at 20-21.)

Respecting the second reason, the ALJ was not imposing his opinion for that of a medical professional. Dr. Miller's notes consistently referenced that Claimant was not in any acute distress. The ALJ simply and reasonably construed this to mean that if Claimant was not in acute distress then the pain was not as severe as he alleged.

The ALJ also found that Dr. Miller's opinions were inconsistent with Claimant's course of treatment. The record reflects that Claimant's treatment was conservative. He was treated primarily with Tramadol and Lodine, as prescribed by Dr. Miller. (Tr. at 21.) Dr. Koja specifically declined to recommend surgery and suggested that Claimant use heat, hot water, and exercise. (Id.) He underwent a course of physical therapy. The ALJ reasonably concluded that one would expect more aggressive treatment than Tramadol if one was as limited as alleged by Claimant and as assessed by Dr. Miller. Accordingly, such conservative treatment is inconsistent with Claimant's allegations of debilitating pain and symptoms.

Both Dr. Franyutti and Dr. Gomez opined that Claimant was capable of performing light exertional level work, consistent with the ALJ's RFC assessment. (Tr. at 25, 188-95, 199.) Although their opinions were rendered prior to Claimant's alleged onset date and prior to some of the medical evidence of record, their reports remain consistent with the evidence as a whole, including the evaluation by Dr. Craft and the treatment notes of Dr. Koja. For these reasons, it is reasonable for the ALJ to have relied on their RFC assessments.

Accordingly, based on the foregoing, the undersigned finds that the ALJ's decision to accord little weight to the opinion of Dr. Miller is supported by substantial evidence of record.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court

confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 13.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 28, 2014.

R. Clarke VanDervort
United States Magistrate Judge

23